**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2849-15T2
                    A-3277-15T2

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

R.L.M. and J.J.,

    Defendants-Appellants.

_____

IN THE MATTER OF THE GUARDIANSHIP
OF R.A.J., a minor.

_____

APPROVED FOR PUBLICATION

April 28, 2017

APPELLATE DIVISION

Submitted February 28, 2017 — Decided April 28, 2017

Before Judges Fisher, Ostrer and Vernoia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FG-01-50-15.

Joseph E. Krakora, Public Defender, attorney for appellant R.L.M. (Theodore J. Baker, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant J.J. (Carol A. Weil, Designated Counsel, on the briefs).

Christopher S. Porrino, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Cynthia Phillips, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

In a February 26, 2016 judgment, the Family Part terminated the parental rights of defendants R.L.M. (Rachel) and J.J. (Jim) to their daughter, R.A.J. (Riley), who was born in December 2013.[1] Both parties challenge aspects of the court's best interests findings under N.J.S.A. 30:4C-15.1(a)(1)-(4). Jim focuses on prongs three and four; Rachel on prong two. In addition, Jim contends he is entitled to a new trial because the court denied his request to represent himself. Rachel asserts the court erred by considering hearsay opinions of non-testifying experts. Riley's Law Guardian joins the Division of Child Protection and Permanency (Division) in opposing the parents' appeal.

Regarding defendants' challenge to the court's best interests findings, we defer to the trial court's fact findings, which were partly based on credibility determinations and supported by substantial record evidence. See N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014); Cesare

---

[1] We utilize the trial court's pseudonyms for the parties, to protect their privacy and for the reader's convenience.

v. Cesare, 154 N.J. 394, 411-13 (1998).  We affirm substantially for the reasons set forth in the trial judge's well-reasoned written decision.

We also find little merit in Rachel's evidentiary argument. Although the trial judge reviewed the opinions of two non-testifying mental health experts who examined Rachel years before trial, it is apparent the error had no impact on the court's ultimate conclusions.  Instead, the court based its holding on the opinions of experts who did testify as to more recent evaluations.

We thus confine our extended comments to Jim's contention that he has a constitutional right of self-representation, the denial of which warrants a new trial.  We conclude there is no such constitutional right, and the court was, in any event, justified in refusing to permit Jim to represent himself because his request was equivocal and untimely.

## I.

We need not review the facts in detail, as the trial court set them forth at length in its forty-three-page written opinion.  It suffices to note that the Division effectuated a

Dodd removal[2] of Riley shortly after her birth. At the time, the Division was engaged in a separate, ultimately successful, guardianship action seeking the termination of parental rights with respect to Rachel's five other children, the youngest of which, a son, was also Jim's child. The court affirmed Riley's removal and granted the Division's request for custody set forth in its December 2013 verified complaint. In February 2015, the court approved a permanency plan of termination of parental rights to be followed by adoption, and the Division filed its guardianship complaint the following April. The court conducted several conferences over the ensuing months before trial in February 2016.

At trial, the Division's case-worker detailed the parents' inconsistent visitation and their failure to timely or fully avail themselves of services — including parenting and mental health services. Alan Lee, Psy.D., testified about psychological and bonding evaluations he conducted. He opined that both parents, in various ways, lacked the psychological and emotional functioning to parent, and prospects were poor for significant improvement in the near future. Dr. Lee stated the parents' respective bonds with Riley were insecure. By

_____

[2] A "Dodd removal" is an emergency removal of a child from the custody of a parent without a court order, as authorized by N.J.S.A. 9:6-8.29 of the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.

contrast, Riley had developed strong, reliable bonds with the resource parents with whom she had lived since birth. He opined neither parent could satisfactorily address the harm Riley would suffer if she were separated from her resource parents and termination of parental rights would not cause more harm than good.

Rachel's treating psychologist over several months, discussed Rachel's positive efforts over the course of twenty-four sessions in improving her problem-solving skills, insight and judgment. The psychologist noted Rachel was learning how to cope with what she diagnosed as a dysthymic disorder.[3] But she did not assess Rachel's parenting ability, and the court sustained an objection to her offering an opinion about whether Rachel was ready to reunify with Riley.

Rachel retained Michael Wiltsey, Ph.D., who diagnosed her with adjustment disorder with mixed anxiety and depression. He

---

[3] "The essential feature of Dysthymic Disorder is a chronically depressed mood that occurs for most of the day more days than not for at least 2 years . . . ." American Psychiatric Association (APA), Diagnostic and Statistical Manual of Mental Disorders, 345 (4th ed. 1994). During periods of depressed mood, a person has two or more of the following: "poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of hopelessness . . . ." Ibid.; see also APA, Diagnostic and Statistical Manual of Mental Disorders, 168 (5th edition 2013) (describing "Persistent Depressive Disorder (Dysthymia)").

observed parenting deficits and declined to recommend immediate reunification. He opined that an assessment could be made regarding parenting capacity after an additional three to six months of strict compliance with services and visitation, but his prognosis was "guarded . . . at best." Neither parent testified, and Jim offered no witnesses in his defense.

The court found that the Division satisfied all four prongs of the best interests test by clear and convincing evidence. This appeal followed.

## II.

Jim argues he is entitled to a new trial because the court deprived him of his constitutional right to represent himself. We conclude there is no such constitutional right in termination of parental rights cases. Moreover, even if there were, Jim failed to assert it in a timely, unequivocal manner.

## A.

We begin with a review of the facts relevant to Jim's argument. Beginning in 2014, Jim was represented by appointed counsel through the Office of the Public Defender. He first broached the subject of self-representation at the May 2015 case management conference that followed the guardianship complaint filing. He proposed to utilize the services of an uncle who was a paralegal. As the following colloquy indicates, although the

court was prepared to recognize a right of self-representation if knowingly and intelligently exercised, the court neither definitely granted nor denied Jim's request:

> THE COURT: But let's move on to another issue. You do not want to have an attorney appointed to represent you, sir?[4]
>
> [Jim]: No. No, ma'am.[5]
>
> THE COURT: And why is that, sir?
>
> [Jim]: That's because I have some motions that I want to put in myself. I actually — There's [sic] motions that I have to put in there. There was a civil matter that I had put in that was just about to be dismissed, and I just got finished putting it together, had my uncle put together a reconsideration. It also has discovery with it. Now what I'm intending to do is my uncle is going to put together a package that's going to be a motion —
>
> THE COURT: Is your uncle an attorney?
>
> [Jim]: He's a paralegal. I'm going to put together — You can look him up. . . . He's going to put in a motion which is going to have some of the things from the civil case and it's going to be in there. It's going to be a grounds which we're going to be asking for, the FG to, I believe he said either be dismissed or whatever the case may be, but that's what's going to be —
>
> THE COURT: Okay.

---

[4] We infer that Jim had previously asked to proceed pro se, but the record does not include evidence of that.

[5] As several judges presided over this matter, we will alter our pronouns accordingly.

A-2849-15T2

[Jim]: It's going to be put in next week, this week. I'm actually going to pick it up later today.

THE COURT: Okay. Sir, I think — Well, let me start off by telling you, you have the right to be represented by counsel, and you have the right to represent yourself. Not having an attorney is a big mistake.

[Jim]: I understand that, ma'am, but I've had —

THE COURT: I just want to go on the record —

[Jim]: — I've had an attorney up to this far and I'm not satisfied. This is where I'm at right now. It's about to be taken and moved to another, another part of the, another section of the case. You're about to go into permanency and everything else. I felt as though if, if having an attorney was so great then we would have a better — I did everything that they asked me to do as far as every, every — I went to psychological, I did whatever they asked me to do, and yet we're still about to move forward, move into another part of the case.

. . . .

THE COURT: — you, you let me know how it works for you when you don't have an attorney, okay?

[Jim]: Yes, ma'am.

. . . .

THE COURT: But certainly you have the right to represent yourself, and if that's what your wish is, as long as I've explained to you what your rights are and I've impressed upon you the mistake that you're making in not having an attorney, but you

8

A-2849-15T2

insist that you want to represent yourself, that is certainly your right. Okay?

Jim did not attend the case management conference the next month. His appointed attorney stated on the record that Jim had been at the courthouse, but left because of illness. The request to represent himself was unmentioned during the ensuing colloquy.

At the October 2015 case management conference, Jim apparently abandoned his request to represent himself. Instead, he advised the court he sought merely to retain substitute counsel.

> [Jim]: I want to get another lawyer. I'm sorry.
>
> THE COURT: Excellent. That's okay. If you wish to do that.
>
> [Jim]: I just want to put it on the record that I'm not satisfied with my, my representation, —
>
> THE COURT: Okay.
>
> [Jim]: — and I'm looking — I actually have [another attorney][6] that was supposed to take my case today, but for some reason she couldn't take it. So —
>
> THE COURT: If you do that and you get another lawyer, you have that lawyer send a letter to the court of representation and come back to court on the date that we are here next time.

---

[6] Jim identified the attorney, whom we choose not to name.

The judge advised Jim that the case would continue to move forward. He advised Jim that his right to appointed counsel did not include the right to choose counsel. Jim responded that he could afford to retain a lawyer:

> [Jim]: That's what I'm saying. I just got [a] retainer fee. I'm going to pay a lawyer.
>
> THE COURT: Excellent.
>
> . . . .
>
> THE COURT: [S]end a letter to the Court. We'll come to court the next time we have a hearing, and we'll have that lawyer step into representation at that point. Until that time [the appointed attorney] remains.
>
> [Jim]: Okay.

Later in the day's proceedings, Jim reiterated, "I'm going to hire an attorney. I'm going to get a new attorney."

Jim did not file a substitution of attorney. Instead, he tried to file at least one motion pro se. At a November 2015 case management conference, which Jim did not attend because of work, the judge stated as long as Jim had representation, she would not consider pro se filings unless they went through counsel. Jim also did not attend the February 1, 2016 hearing, and the issue of self-representation was not addressed.

At the first day of trial, the deputy attorney general noted that Jim had just served all counsel, including his own

A-2849-15T2

attorney, a packet of pro se motions. Included was a "notice of motion for new counsel" and a supporting certification. Jim orally asserted that he had been at odds with his attorney for "the last six or seven months," and that he did not "want him as my attorney," but the court had "still allowed it." He was dissatisfied because his attorney did not file a motion "to have abuse and neglect removed from the record." The "abuse and neglect" apparently referred to his understanding of the basis for his loss of parental rights to his son in the 2014 judgment, which Jim believed would affect his present case concerning Riley.

Jim has not included his motion in the record, but we surmise from the context of the discussion that it was not a request to represent himself, but a request for a new attorney. The judge described it as a "request of [Jim] to replace [his attorney]." (Emphasis added). Later, Jim also stated he had asked for "different representation." After an extended colloquy, the judge denied the request.

The trial commenced with the case-worker's testimony. In the midst of his attorney's cross-examination, Jim interjected his dissatisfaction with the line of questioning. He alleged his attorney did not consult with him. As he began to make other points, the deputy attorney general argued "[i]f [Jim]

wants to testify . . . he should do so." Jim responded that he "wanted to represent himself." Interpreting that statement as a current request to proceed pro se, the judge stated, "Well, we're not going to allow you to do that at this time," and ordered appointed counsel to continue.

The next day, the judge amplified his reasons for denying Jim's requests to change counsel and represent himself. He noted again that Jim requested at the beginning of trial "that his counsel . . . be replaced." The court briefly addressed the substance of Jim's complaint that his attorney's failure to file the motion involving the adjudication related to his son prejudiced him in the current proceeding. The court suggested that Jim's own failure to appear in court may have impaired his relationship with counsel. The court continued:

> [W]hile the Court is sensitive to [Jim's] request to change counsel, we simply find that the request at this late date would only serve to delay the proceedings and unduly interfere with the minor child's attempt to gain permanency in this matter.
>
> Many of defendant [Jim's] complaints about his counsel arise out, out of his unwillingness to cooperate with [counsel]. Even yesterday at the conclusion of the proceedings [counsel] attempted to communicate with [Jim], but [Jim] simply ignored him.
>
> In further assessing the request under the attendant circumstances, the Court rules under State v. Crisafi, [128 N.J. 499

> (1992)], and its progeny that the request to change counsel is hereby denied. So we will continue to proceed with this matter and that will conclude any, any attempts at this time to replace [counsel].

Despite the finality of the court's decision, the matter arose later in the proceeding when Jim interrupted the State's direct examination of Dr. Lee without consent of his counsel. Noting that Dr. Lee's opinion seemed to rely on the prior finding of abuse and neglect, Jim stated he wanted to argue the finding should be discarded. He insisted, "I have documents that say[ ] that I am cleared. I did not do . . . what they said."

He initially clarified that he was "not talking about [his counsel] being dismissed." But Jim was then reminded that his counsel had not filed a motion to challenge the prior finding. Despite his earlier statement, Jim decried the inadequacy of his representation and asserted he did not "want [current counsel] representing me." At that point, the court apparently understood that Jim either wanted to replace counsel or proceed pro se. The court denied his request:

> THE COURT: While . . . it is your right to terminate your attorney, we're in the middle of trial right now. I don't — from what I've seen from you throughout this proceeding — not only throughout this proceeding, but in the months leading up to this proceeding, this Court is not convinced that you could go through the rest of this

13

trial and represent yourself.  Meanwhile, it would be —

[Jim]: Through the —

THE COURT: I have to balance so many issues with respect to terminating this trial right now to allow new counsel to substitute in and come up to speed, that this Court has already made the determination that that would be unfair to the interest of the minor child who has some interest here at stake.

[(Emphasis added).]

In response, Jim tried to allay the court's concerns that he would slow down the trial if he represented himself:

I can promise you this.  I would not object to [anything] that they do.  I — if I was [sic] to take over my case . . . .  I'm not going to put in motions trying to stop them to proceed [sic].  Why?  Because I plan to try to give everything back on appeal. The only thing I would try to establish if I was [sic] to take over this case is the fact that I'm innocent of the [prior] abuse and neglect . . . .  That's it.

The colloquy concluded without a further discussion of Jim's representation.  Instead, the court entered into evidence a letter, which Jim had apparently been holding, that allegedly supported his challenge to the prior abuse and neglect finding. Jim then excused himself from the proceeding and did not return for the rest of the day.  Jim was also absent for most of the trial the next day, after telling his counsel he was sick.  He was present at the start of the final day of trial, but

14

apparently left after refusing to testify. No further discussion regarding his representation occurred.

B.

It is now well-settled that an indigent parent in New Jersey is entitled to appointed counsel in termination of parental rights cases. In re Adoption of a Child by J.E.V. and D.G.V., 226 N.J. 90, 105, 108 (2016); N.J. Div. of Youth & Family Servs. v. B.R., 192 N.J. 301, 306 (2007); Crist v. N.J. Div. of Youth & Family Servs., 135 N.J. Super. 573, 575 (App. Div. 1975). The right arises from the due process guarantee of our State Constitution. J.E.V., supra, 226 N.J. at 105; B.R., supra, 192 N.J. at 305-06 (citing N.J. Const. art. I, ¶ 1).[7] The Legislature has authorized the Office of the Public Defender to implement this right to counsel. See N.J.S.A. 30:4C-15.4(a). The right is also embodied in our Rules of Court. See R. 5:3-4(a). The question presented is whether there is a corollary right of self-representation.

Jim relies on the criminal defendant's right of self-representation. See State v. King, 210 N.J. 2, 16 (2012) ("The

---

[7] By contrast, the United States Supreme Court in Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 31-32, 101 S. Ct. 2153, 2162, 68 L. Ed. 2d 640, 652 (1981), declined to find a federal due process right to counsel in all termination of parental rights cases, requiring instead a case-by-case weighing of interests.

corollary to the right of a criminal defendant to be represented by an attorney is the defendant's right to represent himself." (citing <u>Faretta v. California</u>, 422 <u>U.S.</u> 806, 814, 95 <u>S. Ct.</u> 2525, 2530, 45 <u>L. Ed.</u> 2d 562, 570 (1975))). He notes that, like denial of an accused's right to counsel, denial of a criminal defendant's right of self-representation is a structural error that entitles the defendant to a new trial without considering whether the denial caused harm at trial. <u>See</u> <u>King</u>, <u>supra</u>, 210 <u>N.J.</u> at 22 (citing <u>McKaskle v. Wiggins</u>, 465 <u>U.S.</u> 168, 177 n.8, 104 <u>S. Ct.</u> 944, 950 n.8, 79 <u>L. Ed.</u> 2d 122, 133 n.8 (1984)). Jim contends the denial of the alleged right of self-representation in a termination of parental rights case likewise produces a structural error compelling reversal.

But a criminal defendant's right of self-representation arises from an accused's Sixth Amendment "right . . . to have the Assistance of Counsel for his defence." <u>U.S. Const.</u> amend. VI. <u>See</u> <u>Faretta</u>, <u>supra</u>, 422 <u>U.S.</u> at 818, 95 <u>S. Ct.</u> at 2532, 45 <u>L. Ed.</u> 2d at 572 ("The right of self-representation finds support in the structure of the Sixth Amendment, as well as in the English and colonial jurisprudence from which the Amendment emerged."). The Sixth Amendment does not govern the present matter because a termination of parental rights case is civil. <u>Div. of Youth & Family Servs. v. M.Y.J.P.</u>, 360 <u>N.J. Super.</u> 426,

467 (App. Div.) (holding due process did not "confer a constitutional right of confrontation or mandate a parent's presence" at a civil termination of parental rights trial), certif. denied, 177 N.J. 575 (2003), cert. denied, 540 U.S. 1162, 124 S. Ct. 1176, 157 L. Ed. 2d 1207 (2004); cf. N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 634 (App. Div. 2010) (noting Sixth Amendment safeguards do not apply to civil abuse or neglect case).

Because defendant does not have a right of self-representation under the Sixth Amendment, a different analysis is required to evaluate his claimed right of self-representation. To establish such a right, a parent must demonstrate it arises from the right of procedural due process. In recognizing the right to counsel in contested adoption cases, our Supreme Court expressly applied principles set forth in Mathews v. Eldridge, 424 U.S. 319, 335, 96 S. Ct. 893, 903, 47 L. Ed. 2d 18, 33 (1976), which enunciated a three-factor test for ascertaining the due process protection owed. J.E.V., supra, 226 N.J. at 108. In both J.E.V., involving contested adoptions, and B.R., involving termination of parental rights, the Court has considered: "'the nature of the right involved'; 'the permanency of the threatened loss'; the risk of error at a hearing conducted without the help of counsel; and the State's

interest, which is bounded by its <u>parens</u> <u>patriae</u> jurisdiction."
<u>J.E.V.</u>, <u>supra</u>, 226 <u>N.J.</u> at 108 (quoting <u>B.R.</u>, <u>supra</u>, 192 <u>N.J.</u> at
306).[8]

As the Court in <u>J.E.V.</u> explained, each of these factors
impels the conclusion that a parent is entitled to counsel.  The
nature of the right involved is momentous; it is the parent's
fundamental right to raise one's child.  <u>J.E.V.</u>, <u>supra</u>, 226 <u>N.J.</u>
at 108-09.  Termination of that right in a guardianship matter
is permanent.  <u>Id.</u> at 109.  Also significant is the fact that
"[w]ithout the assistance of counsel to prepare for and
participate in the hearing, the risk of an erroneous outcome is
high."  <u>Id.</u> at 109; <u>see also</u> <u>B.R.</u>, <u>supra</u>, 192 <u>N.J.</u> at 306
(noting "the potential for error in a proceeding in which the
interests of an indigent parent, unskilled in the law, are
pitted against the resources of the State").  The State has an
interest not only in the child's welfare, but also an interest,
shared with the parent, "in an accurate and just decision."
<u>J.E.V.</u>, <u>supra</u>, 226 <u>N.J.</u> at 110 (internal quotation marks and

---

[8] By comparison, <u>Mathews</u> states that, in assessing the "specific
dictates of due process," a court must consider: (1) "the
private interest that will be affected"; (2) "the risk of an
erroneous deprivation of such interest" and the value of other
safeguards; and (3) "the Government's interest, including the
function involved and the fiscal and administrative burdens" of
other safeguards.  <u>Mathews</u>, <u>supra</u>, 424 <u>U.S.</u> at 335, 96 <u>S. Ct.</u> at
903, 47 <u>L. Ed.</u> 2d at 33.

citation omitted).  The Court thus found that the risk of error when a parent is unrepresented compels the right to counsel in TPR cases because it protects the parent's right to raise his or her child as well as the State's and child's interests.

The same risk-of-error factor that supports a parent's right to counsel also weakens a claim to a right of self-representation.[9]  As the J.E.V. Court observed, pro se parents are less likely than counseled ones to defend successfully an ill-founded action to terminate their rights.  226 N.J. at 109; see also Faretta, supra, 422 U.S. at 834, 95 S. Ct. at 2540, 45 L. Ed. 2d at 581 ("It is undeniable that in most criminal prosecutions, defendants could better defend with counsel's guidance than by their own unskilled efforts.").  Recognizing a

---

[9] We recognize that the right to appear pro se also arguably affirms the parent's "individual dignity and autonomy." McKaskle, supra, 465 U.S. at 178, 104 S. Ct. at 951, 79 L. Ed. 2d at 133.  The right of self-representation also has deep historical roots.  In re Civil Commitment of D.Y., 218 N.J. 359, 374-76 (2014).  "The Founders believed that self-representation was a basic right of a free people."  Faretta, supra, 422 U.S. at 830 n.39, 95 S. Ct. at 2538 n.39, 45 L. Ed. 2d at 578 n.39. Yet, Jim does not rest his claim on substantive due process, see Lewis v. Harris, 188 N.J. 415, 435 (2006) (discussing a two-step inquiry to determine whether a fundamental liberty interest exists under substantive due process), nor has our Court explicitly grounded the right to counsel, or the right of self-representation on such grounds.  See D.Y., supra, 218 N.J. at 373, 384 (declining to consider amicus curiae's argument that a sexually violent predator committee has a right to self-representation on substantive due process grounds).  Therefore, we shall not enter such uncharted territory.

right of self-representation in parental rights cases that is as broad as the right in criminal cases may pose an "unacceptable danger that parental rights would be terminated when they should not be." See In re Kathleen K., 953 N.E.2d 773, 778-79 (N.Y. 2011) (Smith, J., concurring) (rejecting grant of Faretta-type right of self-representation in parental rights cases). The enforcement of a right of self-representation in these cases may disserve a parent's private right to raise one's own child.

Moreover, a right of self-representation may undermine the child's, the State's, and the court's shared interest in an accurate result. A self-represented criminal defendant may well be entitled to "go to jail under his own banner." Faretta, supra, 422 U.S. at 839, 95 S. Ct. at 2543, 45 L. Ed. 2d at 584 (Burger, C.J., dissenting) (internal quotation marks and citation omitted). But a parent's self-destructive self-representation in a termination of parental rights hearing affects a broader set of interests than the parent's — including the child's interest in the parental relationship. In addition, as J.E.V. noted, the State shares a concern for the child and "an accurate and just decision." J.E.V., supra, 226 N.J. at 110.

Also, the court has an independent obligation to terminate parental rights "only in those circumstances in which proof of

parental unfitness is clear."  N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012).  A court must guard against delays caused by self-representation that disserve the child's interests in permanency.  See M.Y.J.P., supra, 360 N.J. Super. at 470 ("[D]elays in the adjudication of parental rights cases result in additional costs, and . . . impact negatively upon a child's need for permanency.").  Thus, while a trial court in a criminal case "should not focus on whether a pro se defendant will fare well or badly," State v. Reddish, 181 N.J. 553, 592 (2004), the court may more broadly review a parent's capability to marshal a coherent and organized defense in a termination of parental rights case.

The child's separate representation by a law guardian, required by N.J.S.A. 30:4C-15.4(b), does not always satisfy the child's interest in an accurate result.  The law guardian may often align the child's position with the Division's in a termination of parental rights case.  In those instances, the task of testing the State's claims through the adversary process falls to the parent.  Permitting a parent to appear pro se would thus undermine the "truth-seeking function of the adversary process."  State v. Byrd, 198 N.J. 319, 338 (2009) (internal quotation marks and citation omitted).

Notably, in In re Civil Commitment of D.Y., we found that procedural due process did not compel a right of self-representation in civil commitment hearings under the Sexually Violent Predator Act (SVPA), N.J.S.A. 30:4-27.24 to -27.38. 426 N.J. Super. 436, 443-44 (App. Div. 2012), rev'd on other grounds, 218 N.J. 359 (2014). Invoking the Mathews factors, we observed that, "the private interests affected by civil commitment . . . are substantial . . . ." Id. at 444. However, self-representation was not necessary to protect the defendant's interests in a fair and accurate proceeding, id. at 445, and "self-representation [was] likely to impede the government's interest in ensuring the integrity of the fact-finding process and the fairness of the result reached . . . ." Id. at 446. We concluded there was no right of self-representation "because the significant interests implicated . . . are adequately safeguarded by extant procedural protections, including, most importantly, the right to counsel." Ibid. We reach the same result here.

In sum, we reject Jim's argument that he had a constitutional right of self-representation.[10]

---

[10] We recognize the Court in J.E.V. implicitly contemplated cases in which a parent in a contested adoption may waive the right to counsel. See J.E.V., supra, 226 N.J. at 114. The Court described the trial court's prerequisite inquiry to assure the

(continued)

C.

Although Jim relies on an asserted constitutional right, and a claimed structural error from its denial, we briefly address, for the sake of completeness, non-constitutional sources of the right of self-representation.

Eschewing a constitutional analysis, the Supreme Court in D.Y. found that a SVP defendant has a statutory right to appear pro se at a commitment hearing, but only if standby counsel is present. D.Y., supra, 218 N.J. at 384. The Court relied on two statutory provisions: (1) N.J.S.A. 30:4-27.31, which expressly grants parties a right to appointed counsel if indigent, "[t]he right to present evidence," and "[t]he right to cross-examine witnesses," and (2) N.J.S.A. 30:4-27.29(c), which states that the party "shall have counsel present at the hearing and shall not be permitted to appear at the hearing without counsel." D.Y., supra, 218 N.J. at 384.

_____

(continued)
parent acts knowingly and voluntarily. Ibid. (stating "[i]f a parent wishes to proceed pro se, the court should conduct an abbreviated yet meaningful colloquy to ensure the parent understands the nature of the proceeding as well as the problems" of self-representation (citing State v. Crisafi, 128 N.J. 499, 511-12 (1992))). We do not view the Court's brief discussion to imply a constitutional right to proceed pro se in contested adoption hearings or termination of parental rights cases.

By contrast, <u>N.J.S.A.</u> 30:4C-15.4(a) states "[i]f the parent . . . is indigent and requests counsel, the court shall appoint the Office of the Public Defender to represent the parent." While that provision arguably implies that a parent may withhold a request for counsel, the statute does not explicitly grant a right of self-representation, with or without standby counsel. Nor does the statute expressly grant the parent the right to present evidence and cross-examine witnesses, as does the SVPA.

Our Court Rules generally grant natural persons the right to appear without an attorney in a matter that directly affects them:

> A person not qualifying to practice [law] pursuant to the first paragraph of this rule shall nonetheless be permitted to appear and prosecute or defend an action in any court of this State if the person . . . is a real party in interest to the action or the guardian of the party . . . .
>
> [<u>R.</u> 1:21-1(a).]

As with all Rule-created rights, this right is not absolute. Under <u>Rule</u> 1:1-2(a), a rule "may be relaxed or dispensed with . . . if adherence to it would result in an injustice." Although the relaxation rule is sparingly applied, especially where other Rules address the problem at hand, <u>see, e.g.</u>, <u>Romagnola v. Gillespie, Inc.</u>, 194 <u>N.J.</u> 596, 604 (2008), neither the Rule-based right to appear pro se nor other rules

expressly weigh, as we must here, the child's countervailing interests.

Certainly, a court may limit the Rule-based right to vindicate calendar and other important interests. Cf. State v. Kates, 216 N.J. 393, 396 (2014) (stating that a criminal defendant's constitutional right to counsel of choice "may be balanced against the demands of the court's calendar, among other issues"). Accordingly, a court may relax the Rule-based right of self-representation in a termination of parental rights case if it concludes that, on balance, the parent's pro se efforts would significantly undermine the interests of the child, the State, and the court in achieving an accurate result without undue delay. See In re A.M., 79 Cal. Rptr. 3d 620, 628-29 (Ct. App. 2008) (stating that court has discretion to deny a parent's exercise of a statutory right of self-representation in a juvenile dependency action after balancing parent's right against other rights, including child's right to a prompt resolution of case).

But we need not chart the boundaries of the court's power under the Rules to limit the parent's entitlement to proceed pro se. Nor need we decide definitively whether N.J.S.A. 30:4C-15.4 grants a right to appear pro se with standby counsel. Jim has not asserted a statutory or Rule-based right to represent

himself, nor did he propose to represent himself with the assistance of standby counsel.

In any event, violation of the Court Rule or statute does not automatically compel reversal, as no constitutional deprivation is involved.[11] Instead, we consider whether denial of his alleged right to appear pro se was "clearly capable of producing an unjust result . . . ." R. 2:10-2.[12] Jim does not attempt to demonstrate how the denial of his self-representation right caused actual harm, and we discern none.

### D.

Were we to recognize a right of self-representation, whether under the Constitution, rule, or statute, it would not

---

[11] Automatic reversal based on "structural error" is reserved for constitutional violations. State v. Camacho, 218 N.J. 533, 549 (2014) (noting that structural error has been found "only in a very limited class of cases" and citing examples of constitutional deprivations warranting such treatment (internal quotation marks and citation omitted)); State v. Purnell, 161 N.J. 44, 61 (1999) (stating that "structural error affects the legitimacy of the entire trial," citing limited class of constitutional errors); see also Neder v. United States, 527 U.S. 1, 7, 119 S. Ct. 1827, 1833, 144 L. Ed. 2d 35, 46 (1999) (stating that structural errors are "fundamental constitutional errors that defy analysis by harmless error standards" (internal quotation marks and citation omitted)).

[12] While California Courts apparently agree that there is no constitutional right of self-representation in termination of parental rights cases, they do acknowledge a statutory right, the violation of which is subject to harmless error analysis. See A.M., supra, 79 Cal. Rptr. 3d at 630-31; In re Justin L., 233 Cal. Rptr. 632, 638 (Dist. Ct. App. 1987).

be unqualified. Even a criminal defendant's self-representation right, which is firmly moored in the Sixth Amendment, "is not absolute" and may yield to the "State's equally strong interest in ensuring the fairness of judicial proceedings and the integrity of trial verdicts." King, supra, 210 N.J. at 18; see also Reddish, supra, 181 N.J. at 587. "[T]he right of self-representation is not a license to abuse the dignity of the courtroom." D.Y., supra, 218 N.J. at 385 (quoting Faretta, supra, 422 U.S. at 834 n.46, 95 S. Ct. at 2541 n.46, 45 L. Ed. 2d at 581 n.46). A defendant must assert the right "in a timely fashion" and may not "disrupt the criminal calendar, or a trial in progress." State v. Buhl, 269 N.J. Super. 344, 362 (App. Div.), certif. denied, 135 N.J. 468 (1994).

In particular, a self-representation request "must be made before meaningful trial proceedings have begun." Id. at 363. Also, an "unequivocal" request to represent oneself is a prerequisite to waiving the right to counsel. State v. Figueroa, 186 N.J. 589, 593 n.1 (2006). "[A] defendant cannot 'manipulate the system by wavering between assigned counsel and self-representation.'" Buhl, supra, 269 N.J. Super. at 362 (quoting Crisafi, supra, 128 N.J. at 517).

Jim stated he wanted to represent himself well in advance of trial, at the case management conference in May 2015. But

his request was not unequivocal, as he seemed to propose to rely on his uncle, a paralegal, to assist him. Whether Jim initially sought a form of hybrid representation with a person with some legal training, but unlicensed as an attorney, is unclear.[13] The trial judge did not clarify Jim's request. Yet, the judge's failure to rule on Jim's request turned out to be inconsequential. Jim did not merely waver in his request to represent himself, he effectively withdrew the request the next time he appeared in court. Specifically, he proposed to hire his own attorney and asserted he had the wherewithal to do so. The court stated he was free to hire new counsel, but the case would proceed without delay.

Jim did not thereafter hire an attorney. Nor did he promptly renew his request to represent himself, although he apparently filed pro se motions. Instead, on the eve of trial, he filed a motion that, as best we can tell from the incomplete record, sought to <u>replace</u> appointed counsel with another counsel.[14] Only after cross-examination of the first trial

---

[13] However, Jim would have no right to representation by a paralegal, nor would he have a right to hybrid representation, even if he had a right to represent himself. See <u>Fiqueroa</u>, <u>supra</u>, 186 <u>N.J.</u> at 594 (pertaining to criminal defendant).

[14] We can only surmise as to the contents of Jim's day-of-trial motion, which was not included in the appendix. See <u>R.</u> 2:6-1(a) (stating appellant must include in the appendix "such other (continued)

witness had begun, did Jim revive his request to proceed pro se. The judge correctly denied the request as untimely, since trial had already begun. Jim's second mid-trial request was more untimely.[15]

Thus, even if we recognized a right of self-representation, Jim did not assert it timely or unequivocally. We discern no abuse of discretion in the court's denial of the request to proceed pro se.

In sum, we reject Jim's contention that he is entitled to a new trial on the ground the court denied his constitutional right of self-representation.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

(continued)
parts of the record . . . as are essential to the proper consideration of the issues"); Cmty. Hosp. Grp., Inc. v. Blume Goldfaden, 381 N.J. Super. 119, 127 (App. Div. 2005) ("Nor are we obliged to attempt review of an issue when the relevant portions of the record are not included."), certif. denied, 187 N.J. 489 (2006).

[15] Jim's repeated absences from court during the pendency of his case, as well as during parts of the trial itself, also raise doubts about his ability to represent himself and to do so without disrupting the orderly completion of the trial.