# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2357-17T4

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

M.D.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF G.D.,

      a Minor.

_____

          Submitted December 4, 2018 – Decided December 12, 2018

          Before Judges Sabatino, Haas and Mitterhoff.

          On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket No. FG-06-0036-15.

Joseph E. Krakora, Public Defender, attorney for appellant (John A. Salois, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Katrina A. Sansalone, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant M.D.[1] appeals from the Family Part's June 19, 2017 judgment of guardianship terminating his parental rights to his daughter G.D. (Ginger), born in January 2014. Defendant contends that the Division of Child Protection and Permanency (Division) failed to prove each prong of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence.[2] The Law Guardian supports the termination on appeal as it did before the trial court.

Based on our review of the record and applicable law, we are satisfied that the evidence in favor of the guardianship petition overwhelmingly supports the

---

[1] We refer to the adult parties by initials, and to the children by fictitious names, to protect their privacy. R. 1:38-3(d)(12).

[2] The Division also sought to terminate the parental rights of Ginger's mother, M.B. However, M.B. passed away during the trial.

decision to terminate defendant's parental rights. Accordingly, we affirm substantially for the reasons set forth in Judge Harold U. Johnson, Jr.'s thorough and thoughtful oral decision rendered on June 19, 2017.

We will not recite in detail the history of the Division's involvement with defendant. Instead, we incorporate by reference the factual findings and legal conclusions contained in Judge Johnson's decision, and add the following comments.

When Ginger was born, she tested positive for Subutex, a drug used to treat opioid addiction. M.B.'s family advised the Division that she had obtained the drug illegally. Defendant, who had previously been diagnosed with schizophrenia and bipolar disorder, refused to cooperate with the Division. The parents only visited the baby once while she was in the hospital. M.B. appeared to be under the influence, and defendant fell asleep while holding Ginger and almost dropped her. On March 1, 2014, the Division performed a "Dodd" removal[3] of Ginger.[4] When she was four months old, the Division placed Ginger

---

[3] A "Dodd removal" refers to the emergency removal of a child without a court order, pursuant to the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82. N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

[4] Defendant previously appealed from the Family Part's September 28, 2015 order terminating the Division's action seeking care and custody of Ginger

with her maternal aunt and uncle. These resource parents have cared for Ginger ever since, she is strongly bonded to them, and they wish to adopt her.[5]

The Division provided multiple opportunities to defendant to reunify with his child, and address his long-standing mental health issues and opioid dependency problems. None of these interventions proved successful. The Division's expert psychologist, Dr. James Loving, evaluated defendant and concluded he was suffering from "serious mental health symptoms" that created the risk of "erratic and potentially dangerous behavior." Dr. Loving noted that defendant exhibited "severe adjustment problems in terms of anxiety and depression," "delusional thinking," "psychotic thinking[,]" and other schizophrenic behaviors.

Dr. Loving opined that defendant's "prognosis for change" was "very poor" because he refused to acknowledge his problems, undergo regular treatment, or take appropriate medications. As a result, Dr. Loving testified that

pursuant to N.J.S.A. 9:6-8.21 to -8.106 and N.J.S.A. 30:4C-12 (the FN matter), and directing the case to proceed as a guardianship action under N.J.S.A. 30:5C-15(c) (the FG matter). N.J. Div. of Child Protection and Permanency v. M.D., No. A-1920-15 (App. Div. Oct. 27, 2017) (slip op. at 2). We dismissed that appeal as moot for the reasons set forth in our opinion. Ibid.

[5] Defendant and M.B. have another child, A.D. (Audrey), born in November 2015. Audrey now lives with Ginger under the care of the same resource parents.

A-2357-17T4

defendant was "not in a position to provide safe, stable, healthy parenting . . . in the foreseeable future."

Dr. Loving also diagnosed defendant with "opioid use disorder" based on his use of "opiate pills" like Suboxone for his addiction, and "substance use disorder" as evidenced by his past use of cocaine and marijuana. While the Suboxone defendant used was prescribed by an urgent care doctor in Princeton, and previously by a primary care doctor in Atlantic City,[6] defendant refused to participate in long-term pain management and drug treatment programs offered by the Division to address his abuse of opioids. Dr. Loving testified that while continued Suboxone use can sometimes be a realistic plan for some patients, defendant reported that he planned to wean himself off this medication by taking Percocet, one of the drugs he was taking when he became addicted. Therefore, Dr. Loving opined that defendant needed "a longer term pain management plan" in order to address his substance abuse issues. However, defendant refused to participate in such a program.

---

[6] Neither of these doctors appeared at the trial. The urgent care doctor told the Division caseworker that she prescribed Suboxone because defendant told her he was "receiving psychiatric care and attending treatment through Narcotics Anonymous." However, defendant was not participating in any mental health or substance abuse treatment programs.

A-2357-17T4

Defendant did not offer any expert testimony contradicting Dr. Loving's detailed opinions on his serious mental health and opioid use problems. Defendant also failed to contradict Dr. Loving's expert opinion that he did not have a strong bond with Ginger, especially when compared to the resource parents, who "she had come to know . . . as her primary, most central parent figures." As a result, Dr. Loving opined that if defendant's parental rights were terminated, there would only be a slight risk of harm to the child. On the other hand, there was a high risk that Ginger would suffer serious and enduring emotional harm if she was removed from the care of her resource parents.

After the Division rested and M.B. completed her testimony, the judge granted defendant's request to represent himself during his defense case. Defendant testified on his own behalf, and voiced many of the same paranoid ideations Dr. Loving described at trial. Among other things, defendant alleged that the police were tracking him through his mobile phone and threatening to harm him. He claimed he was involved in a traffic accident with a police car that the police "staged" in order to persuade him to drop certain lawsuits. He stated he contacted the FBI and the U.S. Justice Department to intervene after the police attempted to extort him. At other times, he asserted he lived in "safe

houses" because he was a confidential informant and, therefore, he could not disclose his address to the Division.

As noted above, defendant did not call any expert witness to address Dr. Loving's testimony. On the last day of trial, he presented the testimony of a Division supervisor, who confirmed that defendant had not participated in any mental health or substance abuse programs. Defendant also asked Judge Johnson to issue a subpoena compelling both resource parents to appear in court so he could question them to determine whether they were harming Ginger. The judge asked defendant to provide a factual basis for his claim, and a proffer of what their testimony would allegedly reveal. However, defendant was unable to do so. Therefore, the judge ruled that a subpoena was not appropriate.[7]

In his opinion, Judge Johnson reviewed the evidence presented and concluded that (1) the Division had proven all four prongs of the best interests test by clear and convincing evidence, N.J.S.A. 30:4C-15.1(a); and (2) termination of defendant's parental rights was in the child's best interests. In

---

[7] The judge also rejected defendant's request to call his girlfriend, V.M., as a character witness because she had only limited information about defendant since he admitted he had only known her for about five months. However, the judge stated he would take notice that if she testified, this individual would, "in all probability," state that defendant "has been good for the limited times perhaps that he has seen her children."

A-2357-17T4

this appeal, our review of the trial judge's decision is limited. We defer to his expertise as a Family Part judge, Cesare v. Cesare, 154 N.J. 394, 413 (1998), and we are bound by his factual findings so long as they are supported by sufficient credible evidence. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)).

After reviewing the record, we conclude that Judge Johnson's factual findings are fully supported by the record and, in light of those facts, his legal conclusions are unassailable. We therefore affirm substantially for the reasons that the judge expressed in his well-reasoned opinion, and briefly address the following matters.

Like Judge Johnson, we reject defendant's argument that the Division failed to meet its burden of establishing that Ginger's "safety, health, or development has been or will continue to be endangered by the parental relationship" under N.J.S.A. 30:4C-15.1(a)(1). Defendant alleges that he has never cared for the child, who has lived with her resource parents since May 2014 and, therefore, he was never in a position to "harm" her.

However, there is no requirement that the Division pursue an abuse and neglect finding as a condition for terminating a defendant's parental rights. N.J.

Division of Youth & Family Servs. v. A.P., 408 N.J. Super. 252, 259 (App. Div. 2009). Thus, the appropriate test is not whether defendant actually harmed Ginger, but "whether the child's safety, health or development will be endangered in the future and whether [defendant is] or will be able to eliminate the harm." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 440 (App. Div. 2001). Applying that standard, Dr. Loving's uncontradicted expert testimony amply supports the judge's conclusion that defendant's serious and untreated mental health problems would place Ginger squarely in harm's way if she were placed in defendant's custody, and that this harm could not be eliminated for the foreseeable future.

We also reject defendant's contention that the Division failed to establish that he was "unwilling or unable to eliminate the harm facing" Ginger under N.J.S.A. 30:4C-15.1(a)(2). Defendant asserts that because he was taking Suboxone to address his opioid addiction, there was no requirement that he participate in any formal substance abuse treatment program and, therefore, he should not have been faulted for refusing to do so. However, Dr. Loving opined that a long-term treatment plan was necessary in order to enable defendant to reduce or eliminate his reliance on Suboxone, especially in view of defendant's admission that he intended to wean himself off the drug by taking Percocet, an

even more dangerous and addictive medication. In addition, defendant's argument concerning his substance abuse issues ignores the fact that defendant's mental health problems, which he has also refused to address, formed the primary basis for the judge's finding that defendant could not safely parent Ginger now or in the future.

For these same reasons, we are unable to agree with defendant's argument that the Division failed to make "reasonable efforts to provide services to help [him] correct the circumstances which led to [Ginger's] placement outside the home" under N.J.S.A. 30:4C-15.1(a)(3). Contrary to defendant's assertion, defendant's participation in a long-term substance abuse and pain management program was necessary to help him address his opioid addiction, yet defendant declined this service. He also refused to engage in the mental health services the Division offered.[8]

Defendant also argues that the Division did not "consider[] alternatives to termination of parental rights" under N.J.S.A. 30:4C-15.1(a)(3) because it did not explore kinship legal guardianship (KLG). However, it is clear that KLG

---

[8] Defendant also argues that the Division failed to provide him with appropriate housing. However, he concedes he told the Division on several occasions that he could not provide it with his address because of his work as a confidential informant and because he did not want the police to know where he lived.

A-2357-17T4

was not an appropriate alternative in this case because the resource parents, who were also caring for Ginger's sibling, wanted to adopt her. N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 512-13 (2004) (holding that "when the permanency provided by adoption is available, [KLG] cannot be used as a defense to termination of parental rights").

Finally, defendant alleges that Judge Johnson improperly denied his request to subpoena the resource parents as witnesses, which prevented him from demonstrating under N.J.S.A. 30:4C-15.1(a)(4) that the termination of his parental rights would "do more harm than good" because the resource parents, who intended to adopt Ginger, were not treating her properly. We disagree.

Our standard of review of a trial court's decisions on evidentiary questions is well settled. "When a trial court admits or excludes evidence, its determination is 'entitled to deference absent a showing of an abuse of discretion, i.e., [that] there has been a clear error of judgment.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (alteration in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). "Thus, we will reverse an evidentiary ruling only if it 'was so wide [of] the mark that a manifest denial of justice resulted.'" Ibid. (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

Applying this highly deferential standard of review, we discern no basis for disturbing Judge Johnson's decision to deny defendant's request. As defendant concedes, "there is no explicit constitutional right to compulsory process in a termination of a parental rights case[.]" Indeed, it is well established that the Sixth Amendment does not apply to civil matters, like this termination of parental rights case. N.J. Div. of Child Prot. & Permanency v. R.L.M., 450 N.J. Super. 131, 143 (App. Div. 2017) (citing N.J. Div. of Youth & Family Servs. v. M.Y.J.P., 360 N.J. Super. 426, 467 (App. Div. 2003)); cf. N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 634 (App. Div. 2010) (noting Sixth Amendment safeguards do not apply to civil abuse or neglect case).

Moreover, Judge Johnson allowed defendant to cross-examine all of the witnesses and to call a Division caseworker as his own witness. In denying defendant's request to subpoena the resource parents, the judge explained that defendant was unable to specify any factual basis for his allegation that the resource parents may have harmed the child. Indeed, defendant could not even provide a proffer of their intended testimony. In addition, defendant never lodged any complaint with the Division about the resource parents, and the Division's records and Dr. Loving's expert testimony disclosed nothing

untoward in their treatment of Ginger. Therefore, the judge did not abuse his discretion by denying defendant's request to subpoena the resource parents.

In sum, children are entitled to a permanent, safe and secure home. We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004). As public policy increasingly focuses on a child's need for permanency, "[t]he emphasis has shifted from protracted efforts for reunification with a birth parent to an expeditious, permanent placement to promote the child's well-being." Ibid. (citing N.J.S.A. 30:4C-11.1). That is because "[a] child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable placement." Ibid.

The question then is "whether the parent can become fit in time to meet the needs of the children." N.J. Div. of Youth & Family Servs. v. F.M., 375 N.J. Super. 235, 263 (App. Div. 2005); see also P.P., 180 N.J. at 512 (indicating that even if a parent is trying to change, a child cannot wait indefinitely). After carefully considering the record, Judge Johnson reasonably determined that defendant was unable to parent Ginger, and would not be able to do so for the

13

foreseeable future. Under those circumstances, we agree with the judge that any further delay of permanent placement would not be in the best interests of the child.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2357-17T4